[Crim. No. 10831. First Dist., Div. One. July 16, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSIE CHAVEZ, Defendant and Appellant.

**COUNSEL**

Robert J. Rothman, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Derald E. Granberg and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOLINARI, P. J.**—Defendant appeals from a judgment after trial by the court finding him guilty of voluntary manslaughter. (Pen. Code, § 192, subd. 1.) The sole contention on appeal is whether the trial court committed reversible error when it ordered defendant to turn over to the

prosecution statements given by defendant's witnesses. We have concluded that the trial court erred but that the error was not prejudicial.

In order to place the rationale for our conclusion in the proper perspective, we proceed to set out the salient facts. On Saturday, October 17, 1970, at approximately 8 p.m., Mrs. Eileen Bentley went to Frank's Oasis Bar in Oakland. She joined her friends Bill and Jean Corbett who had been there since 4 p.m. At approximately 11 p.m., Mrs. Bentley's son Richard appeared at the entrance of the bar and asked one of the customers to call his mother over. When she came to the door Richard asked her for 50 cents, which she gave him, and he then departed.

At approximately 1 a.m., Richard returned to the bar in an intoxicated condition, again called his mother to the door, and asked her for another 50 cents. He was accompanied by Jerry Hummingbird, Raymond Hummingbird and Dennis MacBryde. Mrs. Bentley recognized that her son had been drinking, refused him the money, told him to go home and that she would be home soon. However, Richard refused to leave and kept asking for money.

Mrs. Bentley asked Mrs. Corbett to talk with Richard and see if she could get him to go home. Mrs. Corbett did so, told Richard to go home and told him that he would not get any more money. During this conversation Mr. Corbett came to the door and told Richard that he was drunk and to go home. An argument ensued between Corbett, Richard and Jerry Hummingbird.

A patron called the argument to the attention of the bartender, Edwin ("Eddy") Morgado, who picked up his .25 caliber automatic pistol and headed for the door. At this point Mrs. Corbett pulled her husband away from the door. As Morgado rounded the bar toward the door, defendant stood up and also headed for the door. As defendant proceeded towards the door Mrs. Bentley stated to defendant not to worry about the incident and that Richard was her son. Mrs. Corbett also told him to avoid the argument. Defendant made no reply to Mrs. Bentley or Mrs. Corbett, but proceeded to follow Morgado toward the door.

When Morgado arrived at the door Richard was leaning against the wall holding a knife in his left hand about waist high with the blade in a sideways position. Morgado realized that Richard was not pointing the knife at him and told him to put it away. At this point defendant fired a gun at Richard who was shot in the head and died as a result of the gunshot. Immediately after the shooting defendant ran away from the premises with the gun in hand.

Defendant testified that he saw Corbett trying to get at Richard. He stepped forward in an attempt to stop an already heated argument. He stated that Mrs. Corbett slapped Richard, that Morgado appeared with a pistol and that Richard suddenly produced a knife and pointed it at defendant. Defendant testified that at this time he became frightened, drew his revolver and it accidentally went off.

Defendant produced a number of witnesses who testified that Richard and Corbett had quarreled on both of the occasions that Richard had come to the bar. Defense testimony was adduced that Richard had stated he was going to "get" Corbett the next day; that Mrs. Corbett had slapped Richard; and that defendant had come to the door to try and calm things down.

On five separate occasions during the trial the prosecutor requested and was permitted discovery, over defense objections, of statements made by certain defense witnesses to John Patrick Kelly, an investigator for the public defender's office of Alameda County. Discovery was permitted of statements given by Corbett, Jerry Hummingbird, Raymond Hummingbird, and Phillip Cullinan during their cross-examination by the prosecutor, and, on the direct examination of Kelly, of the statements given by Corbett, Morgado, and Jerry Hummingbird. The defense objections directed to such discovery were essentially predicated on the basis that they constituted the "work product" of defense counsel and that to permit such discovery constituted a violation of defendant's constitutional rights. These rights were asserted to be the right to due process and the rights protected by the Fifth and Sixth Amendments. In the instances involving Corbett and Kelly, defense counsel offered to submit the statements to the trial court for a determination as to what portions were subject to discovery. These offers were rejected by the trial court.

Defendant contends on appeal that the court erred in ordering his attorney to furnish his work product to the prosecution and that the trial court's discovery order deprived him of equal protection under the law and was a violation of due process.

Defendant urges that section 2016, subdivision (b), and subdivision (g), of the Code of Civil Procedure preclude discovery of an attorney's research and investigation except in the most extreme cases. Section 2016, subdivision (b), in pertinent part, provides: ". . . The work product of an attorney shall not be discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing his claim or defense or will result in an injustice, and any writing that reflects an attorney's impressions, conclusions, opinions, or

legal research or theories shall not be discoverable under any circum-stances." Section 2016, subdivision (g), provides, in pertinent part: "It is the policy of this state (i) to preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases and (ii) to prevent an attorney from taking undue advantage of his adversary's industry or efforts."

In *Clark* v. *Superior Court,* 190 Cal.App.2d 739, 742 [12 Cal.Rptr. 191], it was held that the statutes in the Code of Civil Procedure pertain-ing to depositions and discovery (§ 2016 et seq.) apply only to civil actions and proceedings. Assuming, arguendo, that the subject statutes are applicable to criminal proceedings, defendant has made no showing that the discovered prior statements reflected the "impressions, conclusions, opinions, or legal research or theories" of his attorney. We observe, more-over, that the trial court apparently permitted the discovery of the sub-ject statements, notwithstanding defense counsel's claim of work product, on the basis that the denial of the use of such statements would unfairly prejudice the People and would result in an injustice. Under subdivision (b) of section 2016 of the Code of Civil Procedure, the work product of an attorney is discoverable if the court determines that the denial of dis-covery will unfairly prejudice the party seeking discovery or will result in an injustice. We observe, in this respect, that no showing was made by the People that prejudice or injustice would result from a denial of such discovery.

We proceed to consider whether, notwithstanding the inapplicability of the "work product" principle, the People were nevertheless entitled to dis-covery. In *Prudhomme* v. *Superior Court,* 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], a case dealing with pretrial discovery, the Supreme Court articulated a standard to be applied by prosecutors in criminal actions. Under that standard the principal element in determining whether a par-ticular demand for discovery should be allowed is whether the disclosure conceivably might lighten the prosecution's burden of proving its case in chief. (*Prudhomme* v. *Superior Court, supra,* at p. 326; see *Rodriguez* v. *Superior Court,* 9 Cal.App.3d 493, 496 [88 Cal.Rptr. 154]; *People* v. *Griffin,* 18 Cal.App.3d 864, 870-871 [96 Cal.Rptr. 218]; *People* v. *Grey,* 23 Cal.App.3d 456, 463 [100 Cal.Rptr. 245].) The rationale underlying this statement is that a defendant must be given the same right as an ordinary witness to show that disclosure of particular information could incriminate him. (*Prudhomme* v. *Superior Court, supra.*)

The *Prudhomme* principle was extended to discovery during trial in *People* v. *Bais,* 31 Cal.App.3d 663 [107 Cal.Rptr. 519]. In that case the

prosecution, after it had rested and following direct examination of two alibi witnesses, moved for discovery of extrajudicial statements made by such witnesses. The motion was granted without inquiry by the court into the incriminating nature of the information sought. The reviewing court, in reversing the judgment of conviction, applied the *Prudhomme* principle and held that the order granting discovery violated the defendant's privilege against self-incrimination. (31 Cal.App.3d at p. 669.) *Bais* points out that discovery by the prosecution can lighten its burden in the constitutional sense even when permitted during the course of trial and even after the prosecution has rested since the prosecution may, for good reason and in furtherance of justice, be permitted to reopen its "case in chief." (31 Cal. App.3d at pp. 671-672.) Accordingly, "prosecution discovery must be denied, regardless of when requested, if the trial court determines that the matters to be disclosed will conceivably 'lighten' the 'burden' which the prosecution bears *in bringing about a conviction of the accused." (People* v. *Bais, supra,* 31 Cal.App.3d at p. 672.) In order to make this determination a trial court is required to examine the matters to be disclosed before granting prosecution discovery and its failure to do so is error. (*People* v. *Bais, supra,* 31 Cal.App.3d at p. 673.)

■ Adverting to the instant case we find that the court below did not examine the statements before granting prosecution discovery. At the time the discovery was objected to it was conceivable that the statements could contain matters that could aid the prosecution's case in chief and thus lighten its burden of proof. It was equally conceivable at that time that the respective statements could have contained matter which would serve to impeach the defense witness who gave the statement to the defense investigator. As to the latter category, we perceive that under our adversary system in the conduct of trials the prosecutor would have been entitled to discover whether the statements contained any matter that would serve to impeach the witness's testimony at the trial. This conclusion necessarily follows because the witness by his appearance on the stand vouches for his testimony then given and thus subjects it to the proper scrutiny of cross-examination and its concomitant right to the presentation of available matter of impeachment in the ascertainment of the truth.

The procedural defect in the instant case was the trial court's failure to examine the statements in order to determine whether they contained any impeaching matter and, if they did, to effectively separate such matter from other non-impeaching collateral matter which might be of assistance to the prosecution in proving its case and thus lighten its prosecutorial burden. By its failure to so examine the subject statements the trial court

opened them to the prosecutor's perusal in their entirety and without the safeguards and restrictions delineated in *Prudhomme*. In view of the possibility existing at the time of its ruling that the statements could contain matters other than those of an impeaching nature, the trial court erred in permitting prosecution discovery without first determining whether such discovery could provide, aside from the impeaching matter, an essential link in a chain of evidence underlying the prosecution's case in chief and thus lighten its burden in bringing about a conviction of defendant.

■ We must now assess the gravity of the error and determine whether it was prejudicial. Since the trial court's discovery error violated defendant's Fifth Amendment privilege against compulsory self-incrimination, the error was of federal constitutional dimensions. (*Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, 323-326; *People* v. *Bais, supra,* 31 Cal.App.3d 663, 675.) Accordingly, in order for the judgment to stand we must be able to declare that the error was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Bais, supra.*)

Defendant has not indicated how or in what manner the subject discovery prejudiced his case. Our own review of the record discloses that the orders to produce the subject statements, even though erroneous, created little or no prejudice.

We first observe that with respect to the witnesses Jerry Hummingbird and Raymond Hummingbird, their statements were not alluded to in the presence of the jury. Jerry testified concerning his observation of the events on the evening of the homicide and was cross-examined extensively with respect thereto. Raymond testified briefly and only to the effect that he had observed Jean Corbett slap Richard Bentley on the night Bentley was shot and the cross-examination was confined to this occurrence, what he observed as to the placement of the people at the bar, and as to whether Raymond was intoxicated.

With respect to the witnesses Corbett and Cullinan, their respective statements to Investigator Kelly were used in the following manner: Corbett's statement was used by the prosecutor to show discrepancies in Corbett's testimony at the preliminary examination and the statement given to Kelly as to when Corbett and defendant came to the bar. These discrepancies were insubstantial. As regards Cullinan, he was asked in the jury's presence on cross-examination whether he had given a statement to Kelly, to which he responded in the affirmative, and whether he had since seen the statement or heard a transcription of it, to which he responded in the negative. The statement was not thereafter alluded to,

but the witness was examined by the prosecutor as to his observations of the shooting, the placement of the people at the bar, and defendant's actions after the shooting.

As respects the witness Kelly, it appears that during his direct examination he referred to certain written statements given him by Morgado, Corbett and Jerry Hummingbird. With respect to the Morgado statement, Kelly was asked three questions. The first question was as to where defendant was standing in relation to Morgado at the time of the shooting. Reading from the statement Kelly stated that Morgado replied "He was standing alongside of me." The second question was whether Morgado had stated anything as to where Corbett was standing and if Corbett was at the door area "when the knife was out." Reading from the statement Kelly stated that Bill and Jean Corbett were at the door talking to Bentley and that Corbett was at the door when Bentley had the knife. The third question was as to whether Morgado was absolutely positive he told Bentley to put the knife away. Reading from the statement, Kelly stated that Morgado said he saw the knife, told him to put it away, and that when he started to do so Morgado put the gun back in his pocket.

As regards Corbett's statement, Kelly was asked whether Corbett had stated to Kelly that he had seen the gun go off in the hand of defendant. The answer read from the statement was: "After the gun shot went off, by the time I turned around Chavez was out the door." Adverting to Jerry Hummingbird's statement, Kelly was asked what Hummingbird had stated as to the position of the gun in defendant's hand when he saw it go off. The answer read from the statement was as follows: "Yep, I seen it. He had it like this and I seen smoke come out the sweater or shirt, whatever he had on he shot right through what he was wearing it looked like to me."

Prior to this interrogation of Kelly defendant's counsel had indicated that these specific questions were being asked for purposes of impeachment. Upon completion of Kelly's response to these specific questions the prosecutor moved to discover the statements to "find out what in fact they contain and also if there are other statements contained therein that may explain alleged inconsistencies brought forth by the Public Defender." The motion was granted. On cross-examination Kelly was asked only two questions. The first was whether Corbett had indicated to Kelly that at the time the Corbetts heard the gun go off they were on their way back to their seats. The second was whether Corbett had stated that when he heard the gun go off he looked around and saw defendant going out the door. To each of these questions Kelly responded "Yes."

We observe that when discovery was sought of the statements from which Kelly had read his responses to questions on direct examination, discovery had previously been granted as to the statements given Kelly by Corbett and Jerry Hummingbird. The only additional statement produced by the discovery order while Kelly was being examined was that given by Morgado. Since these statements were produced by defendant in conjunction with Kelly's testimony allegedly for purposes of impeaching Corbett, Jerry Hummingbird and Morgado, and since the statements were shown to Kelly while he was testifying, the prosecutor had a right to inspect the statements. (Evid. Code, §§ 768, 771.) We apprehend, however, in view of the *Prudhomme* rule, that such inspection should have been limited to an inspection of the matters to which Kelly testified and not to an inspection of the entire statement without a prior examination to determine whether the statement contained matters which would aid the prosecution's case other than the matters in the statement testified to by the witness.

From an examination of the record we fail to perceive how or in what manner any of the statements assisted the prosecutor in proving his case. The prosecutor's cross-examination of these witnesses does not appear to have been aided by his having perused the statements. There is nothing in the record to indicate that these statements negated defendant's involvement in the death of Richard Bentley or that they contradicted the testimony adduced by the witnesses as to the relevant circumstances surrounding the shooting. The shooting of Bentley by defendant was not in dispute. It was admitted by defendant himself. Moreover, there is nothing in the record to suggest that the subject statements controverted defendant's testimony that his gun accidentally went off. In sum, the record discloses that the prosecution's case in chief was well supported by the evidence adduced by the prosecution and that it was not perceptively aided by the prosecution's discovery of the subject statement. Accordingly, we are able to declare that the error in permitting such discovery was harmless beyond a reasonable doubt.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.