[No. F012537. Fifth Dist. May 3, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
SADIE MAE MOTEN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts 1, 3, 4, 5, and 6.

COUNSEL

Colin J. Heran, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Jane N. Kirkland and Leslie B. Fleming, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

THAXTER, J.—Appellant Sadie Mae Moten was convicted after jury trial on one count of first degree murder (Pen. Code,[1] § 187) and one count of felony child endangerment (§ 273a, subd. (1)). The victim of each offense was Moten's eight-week-old daughter. Moten was sentenced to prison for a term of 25 years to life for the murder conviction and 6 years for the child endangerment conviction. The sentence on the second count was stayed pursuant to section 654.

## FACTS

On June 13, 1988, Moten gave birth to a daughter, Dorothy Monique Nelson. Dorothy was approximately four weeks premature and weighed four pounds nine ounces at birth. Other than being small in size, Dorothy was a healthy baby when discharged from the hospital two days later. Dorothy died on August 11, 1988. The cause of death was severe malnutrition and dehydration. Simply and tragically, Dorothy starved to death.

Moten delivered Dorothy at Kern Medical Center (KMC). Dorothy was her second child, her first being a son, Henry. Henry was a healthy one and one-half-year-old when Dorothy died. Moten had no prenatal care. She admitted to using drugs during her pregnancy. Although Dorothy tested positive for cocaine at birth, she apparently suffered no identified ill effects from her exposure to the drug. Moten's prenatal drug usage did not contribute to Dorothy's death.

After leaving the hospital, Moten and Dorothy were visited by Kern County Public Health Department nurse Martha Colarusso. Colarusso first visited Dorothy on June 22, 1988. At that time, Moten, Dorothy, and

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Henry were living with Moten's mother. Colarusso talked with Moten about caring for Dorothy. She gave Moten instructions on how to feed Dorothy, explaining the baby needed food at least every three hours. Moten was told to keep a record of how much food the baby consumed. Colarusso told Moten about a service offered to low-income mothers which would provide Moten with free formula. Colarusso felt Dorothy was doing well at that time and the interaction between Moten and Dorothy was good. This was confirmed by Katie Germany, a child protective services worker, who also visited the family in June.

On June 29, 1988, Colarusso visited the family once more. During this visit, Colarusso discovered that Dorothy was losing instead of gaining weight. This concerned her. She again talked with Moten about feeding. She encouraged Moten to keep her medical appointments at KMC and to have the baby seen as soon as possible at KMC so she could be examined. Moten told Colarusso she and Dorothy had an appointment at KMC on July 7. Colarusso notified child protective services of her concern. She called Moten back that same day and informed Moten about a walk-in clinic available through KMC. Thereafter, she attempted almost daily to contact Moten until Moten and Dorothy moved outside of Colarusso's assigned area.

Colarusso was unable, however, to maintain contact. Each time she called or visited the residence, Moten and Dorothy were gone. Colarusso left messages to no avail. On July 5, Colarusso received a note in her office that Moten had called and said she could not get Dorothy into the clinic until the next week. In a later conversation that same day, Moten told Colarusso she had the baby weighed at the Kern County Economic Opportunities Commission clinic (K.C.E.O.C.) and Dorothy weighed four pounds thirteen ounces. However, Moten never kept the appointment at KMC. When Colarusso called after the 7th, she was unable to reach Moten. Colarusso talked with various relatives who did not always know where Moten and the baby were. Colarusso was told that the baby was doing well and, on one occasion, that Moten and the baby had gone to KMC. No visit to KMC was ever made.

On August 3, 1988, Colarusso discovered that Moten had moved out of her assigned area. Moten, Henry and Dorothy moved to stay with Moten's brother Tommy for a while. As a result, the case was transferred to Janette Weldon, another public health nurse. Weldon was unable to contact Moten before the baby's death on August 11.

Dorothy died the morning of August 11 while under the care of Tommy Moten and his live-in girlfriend. Moten was not present. She had gone for a short visit to see a friend who lived down the street. When the family

discovered Dorothy was not breathing, Moten and emergency personnel were summoned. The police officers and paramedics who responded were unable to detect signs of life from Dorothy when they arrived. Attempts to revive her failed. Those responding were shocked at the condition of the baby. The child was literally wasted away, mere skin and bones. The responding officers described the child as an "Ethiopian baby," small and extremely malnourished. When officers arrived at the scene, Moten was hysterical. There were many people present and much confusion.

When the investigating officer interviewed Moten after Dorothy's death, she stated Dorothy had been doing well and eating until three days prior to her death. According to Moten, Dorothy stopped eating on August 9, had not eaten anything on August 10, and had a few swallows on August 11. Moten said she had changed Dorothy's formula from Similac to soybean-based Prosoybee and that Dorothy liked the new formula better. Moten was cooperative during the investigation.

The autopsy revealed the baby had not received any nutrition for "some weeks." There was no sign of any food in the baby's digestive tract. The body had utilized all its fat and had begun to break down the skeletal muscle tissue. The pathologist stated babies are born with a generous amount of baby fat which, in Dorothy's body, had been depleted. The body was severely dehydrated. Dorothy had not received any fluid for a long period, perhaps as much as two days. The autopsy revealed no other abnormalities or illness which would explain the baby's death or her condition other than a simple deprivation of nutrition and liquids.

Dr. Tim Khuu, a neonatologist at KMC, testified for the prosecution. Dr. Khuu stated that Dorothy was a healthy, albeit slightly premature, infant at birth. Dorothy was kept in the hospital for two days after birth in order to stabilize her body temperature. However, once she reached four pounds four ounces, had learned to suck a bottle well, and was able to maintain an appropriate body temperature, she was released. He explained a baby should double its weight within the first four to five months of life, and opined that Dorothy would have been able to do this if properly fed.

Dr. Khuu explained that the first sign of malnutrition is the loss of body fat. The baby's skin becomes dry and wrinkled, the baby less and less active. The first two days the baby will cry because it is hungry, but after that the baby will become lethargic. He stated it could take up to six days to become dehydrated. After reviewing the pictures of Dorothy taken immediately after her death, Dr. Khuu stated Dorothy was severely dehydrated. He stated he had not seen any babies in this condition in the United States, but he had seen this type of condition in Third World countries.

In addition to the testimonial evidence, the prosecution relied heavily on photographs of Dorothy. The first was taken shortly after Dorothy's birth, the others were taken after her death. The pictures are tragic statements of Dorothy's emaciated state at the time of her death and the marked deterioration of her health from birth.

*Defense*

Moten testified in her own behalf. Several of her friends and family members testified as well. Moten testified she fed Dorothy properly and that until shortly before Dorothy's death she ate "fine." Her trial testimony was fairly consistent with her statements to the investigating officer. Moten said Dorothy was small and had wrinkled skin but she did not believe Dorothy was sick or needed to go to the hospital. Moten said she did not receive instructions about feeding Dorothy because she already knew "how to do that."

Moten testified she fed Dorothy two to three times a day, about every four or five hours. She fed Dorothy formula (Similac) mainly, but would on occasion give her water (until told not to by the public health nurse) or juice. Shortly before Dorothy's death, Dorothy began to refuse the food and spit up after feeding. Moten testified she called her sister who advised Moten to change formula (to Prosoybee) which she did. She believed changing the formula had corrected the problem which is why she did not take Dorothy to the hospital. She denied using drugs after Dorothy's birth and there is no evidence that she did.

She claimed she loved Dorothy and did not make a decision to let her starve. Moten stated she fed Dorothy immediately before leaving her in the care of her brother the morning of Dorothy's death. She testified she did not receive the many messages left with her family by the public health nurse. She also stated she missed the appointments made for Dorothy because she did not have transportation and because she forgot.

On August 5, Moten went to the clinic for her own checkup. She did not bring Dorothy with her. During the appointment, Moten told the doctor that the baby was doing well. According to Moten, Dorothy was doing well at that time.

Moten's friends and family members testified generally that Moten fed Dorothy, that Dorothy was small, that her skin was wrinkled and that if Dorothy had been their child they would have taken her for medical care. However, the testimony concerning the amount and times Moten fed Dorothy and how well Dorothy ate was conflicting.

DISCUSSION

1. APPELLANT'S WHEELER MOTION WAS PROPERLY DENIED*

. . . . . . . . . . . . . . . . . .

2. IT WAS REVERSIBLE ERROR TO ADMIT EVIDENCE OF MOTEN'S PRENATAL DRUG USAGE

Moten contends the court erred when it denied her motion to exclude evidence of her drug usage during pregnancy. We agree.

It is well settled that "admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883], fn. omitted.) Such evidence must be scrutinized carefully. Its admission depends on: 1) the materiality of fact sought to be proved or disproved, 2) the tendency of the uncharged crime to prove or disprove the material fact, and 3) the existence of any rule or policy requiring the exclusion of relevant evidence. (*Id.* at p. 315.) In order to satisfy the materiality requirement, the fact proved or the permissible inference to be drawn must result in or logically lead to the establishment of an ultimate fact in dispute. (*Id.* at p. 315, fn. 14.)

Other crimes evidence is generally admissible where it tends to establish identity, guilty knowledge, motive, intent, preparation, presence of common design or plan, or to overcome any material matter sought to be proved by the defendant. (*People* v. *DeRango* (1981) 115 Cal.App.3d 583, 588 [171 Cal.Rptr. 429]; *People* v. *Peete* (1946) 28 Cal.2d 306, 315 [169 P.2d 924].)

However, because evidence of other crimes always involves the risk of serious prejudice regardless of its probative value, Evidence Code section 352 requires that the trial court weigh the probative value of the proffered evidence against the potential for unfair prejudice. If the probative value is slight and the potential for prejudice great, the evidence should be excluded even if otherwise admissible. (*People* v. *Turner* (1990) 50 Cal.3d 668, 703-705 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Thompson, supra,* 27 Cal.3d at p. 318.) The exclusion or admission of evidence is within the sound discretion of the trial court and will not be disturbed absent a

---

*See footnote, *ante*, page 1318.

manifest abuse of discretion. (*People* v. *Tamborrino* (1989) 215 Cal.App.3d 575, 588 [263 Cal.Rptr. 731].)

 In the instant case, Moten made an *in limine* motion to exclude all reference to her drug usage during pregnancy. Moten's counsel relied on Evidence Code section 352, arguing that the drug usage evidence would be more prejudicial than probative. In arguing against the motion the prosecutor told the court that evidence showing Dorothy had cocaine in her system at birth would be relied on "to establish the abuse and certain elements of the murder. . . . [The evidence] show[s] this mother was willing before the child was even delivered to abuse it, and did abuse it, and that abuse continued on after the child was born."

The court denied Moten's *in limine* motion, commenting that "you have to rely on medical testimony rather than a Court to say that a child dies eight weeks after birth that something had occurred prior to birth is or is not the cause of death or contributing cause of death." This comment indicates the court was under the impression that expert medical testimony would link Moten's drug use during pregnancy with Dorothy's death eight weeks after birth. The prosecutor did not inform the court that, in fact, no such evidence would be offered.

Moten's trial counsel asked the court to review transcripts of the preliminary hearing and the hearing on Moten's unsuccessful motion under section 995. The court declined to do so. Those transcripts, and the subsequent trial testimony, disclose that the cause of death was dehydration and starvation. There was no evidence that drug usage during pregnancy in any way contributed to the infant's death or produced physical injury to the child. Drug screens performed in conjunction with the autopsy were negative.

The prosecutor's comment that evidence of Moten's prenatal drug use would "establish the abuse" suggests he may have been offering it as proof of an element of the offense charged in the second count. That count, however, expressly charged Moten with child endangerment during the period of June 13, 1988, (Dorothy's date of birth) through August 11, 1988. There was no allegation that Moten abused Dorothy before June 13.

The evidence was irrelevant and inadmissible on either the ground stated by the court (a factor contributing to the cause of death) or the alternative ground suggested by the prosecutor (child endangerment). (Evid. Code, § 351.) On appeal respondent does not argue to the contrary. Instead, respondent contends the evidence was relevant in showing Moten's state of mind, contending that "[e]vidence of appellant's state of mind prior to birth was probative of her state of mind after birth. Thus, the jury could infer that

appellant's prenatal indifference toward baby Dorothy continued after birth. Accordingly, appellant's attitude towards her child was highly probative of a material issue in dispute, i.e., whether the death was the result of a deliberate and premeditated act committed with malice aforethought." This argument suffers from the complete absence of evidence showing that Moten was aware her ingestion of drugs during pregnancy might endanger her fetus. The prosecution offered no such evidence. Moten's uncontradicted testimony was that she received no prenatal care and became aware of the possible danger to the fetus only *after* Dorothy was born.

Even if a jury could reasonably infer that Moten knew she was endangering her unborn child by taking drugs during pregnancy, the additional inference that her attitude before birth indicates premeditation in starving Dorothy after birth is tenuous at best. The evidence was highly inflammatory and created "substantial danger of undue prejudice," which, in our view, clearly outweighed the slight probative value. Failure to exclude the evidence under Evidence Code section 352 was an abuse of discretion.

■ Having found error, we now consider whether admission of the challenged evidence requires reversal. The standard of review is governed by *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (*People* v. *Hecker* (1990) 219 Cal.App.3d 1238, 1246 [268 Cal.Rptr. 884].) Reversal is required if it is reasonably probable a result more favorable to Moten would have been reached without the erroneously admitted evidence. We will apply this standard to each of the two convictions.

■ There is little evidence of premeditation and deliberation supporting the conviction of first degree murder. The prosecutor relied heavily on Moten's prenatal cocaine use to provide the jury with a motive and to establish a premeditated decision to let Dorothy starve to death. The subject was referred to frequently throughout all stages of the trial. During arguments the prosecutor said:

"So how did Sadie Mae Moten make this a first degree murder? Sadie Mae Moten went to the doctor six days before her baby died and didn't mention a word about the condition of her daughter. . . .

"We've gone through no food and no water. But what is most important here is, or very important is the cocaine, because I asked her yesterday about it. After she said from the stand as many times as she could that she loved this baby and she loved the baby just as much after it died as she did before it died, she told—remember that. When you go back there and decide whether or not that you believe that this mother cared, remember

that. And then remember that when Dorothy was born, Dorothy had cocaine in her system. The same woman that wants you to believe that she cared about and loved her child before it was born, knowingly used cocaine when that child was inside of her."

The prosecutor continued arguing that a woman who used cocaine during pregnancy could not possibly care about the baby. The prosecutor concluded by inferring Moten used drugs *after* Dorothy's birth: "I can't tell you if it [letting the baby starve] is because she was—felt her drugs were more important to her—" At that point defense counsel objected with good reason stating there was no evidence to support the prosecutor's statement. The trial court warned the prosecutor to "hold onto the evidence." No admonition was requested or given. (Defense counsel moved for a mistrial based on the improper argument. The motion was denied.)

The evidence of prenatal drug use was obviously the peg upon which the prosecutor hung the first degree murder charge. The prosecutor touched on the possibility that Moten let Dorothy starve because she believed the child was "retarded." However, the evidence did not support this theory and the prosecutor gave only scant attention to it in his closing argument.

After reviewing the entire record, we conclude it is not reasonably probable that the jury would have returned with the murder conviction absent the prejudicial evidence of Moten's prenatal drug usage and the suggestion that the use of drugs is what led her to neglect Dorothy. The murder conviction must be reversed.

■ Moten's conviction of child endangerment, however, stands on a different footing. The mens rea of that offense is either general criminal intent or criminal negligence. (§ 273a, subd. (1); CALJIC No. 9.37.) The uncontradicted evidence was that Moten knew how to properly care for Dorothy. The medical testimony that Dorothy starved to death and other evidence, including the photographs depicting Dorothy's appearance, almost compel the conclusion that Moten, for whatever reason, willfully failed to feed Dorothy or see that she received proper care. Even without the drug usage evidence it is not reasonably probable the jury would have returned a verdict more favorable to Moten on the child endangerment count. Reversal of that conviction is not required.

Since we have determined the evidence was improperly admitted, the claim of instructional error regarding the drug usage evidence is moot. Moten's contention on appeal is that the court erred when it failed to give sua sponte an instruction limiting the jury's consideration of the evidence,

relying on dictum in *People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]. (CALJIC No. 2.50.)

3.-6.\*

· · · · · · · · · · · · · · · · · · · · ·

## DISPOSITION

The judgment of conviction of first degree murder is reversed and the matter is remanded for further proceedings on the first count consistent with this opinion and for resentencing. The judgment of conviction of child endangerment is affirmed.

Martin, Acting P. J., and Vartabedian, J., concurred.

A petition for a rehearing was denied May 29, 1991.

---

\*See footnote, *ante*, page 1318.