Filed 9/26/13  P. v. Ortiz CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B243537 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA124476) |
| v. | |
| ERIC JOSE ORTIZ and RICARDO VELASQUEZ, | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Dewey Lawes Falcone, Judge.  Affirmed.

Eric Jose Ortiz, in pro. per., and Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Ortiz.

Jeffrey J. Douglas, under appointment by the Court of Appeal, for Defendant and Appellant Velasquez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Eric E. Reynolds and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants Eric Jose Ortiz and Ricardo Velasquez appeal from the judgments entered following a jury trial in which they were convicted of two counts of second degree robbery. Velasquez contends the trial court erred by failing to instruct, sua sponte, with CALJIC No. 2.05. Appellate counsel for Ortiz filed an opening brief raising no issues and asking this court to perform an independent review of the record. We affirm the judgments.

## BACKGROUND

About 11:30 p.m. on April 14, 2012, two men got out of a white Jeep Grand Cherokee and approached Jordy Cabrera and Fabian Quevedo as they were walking toward Cabrera's car in Los Angeles. (Date references pertain to 2012.) The two men demanded that Cabrera and Quevedo hand over their property. Cabrera and Quevedo later told Deputy Joshua Delfin that each assailant had a gun; one pointed his gun at Cabrera's head and the other at Quevedo's head. Cabrera gave his assailant everything in his pockets, which included his wallet containing his identification card and the keys to his car. Quevedo handed over his money and a red Samsung mobile phone. The two robbers got back inside the Jeep Grand Cherokee and left. Because the robbers had taken the key to his car, Cabrera decided to wait next to his car, in case they returned to take it.

The white Jeep Grand Cherokee returned, so Cabrera and Quevedo returned to a party they had attended before the robbery and Cabrera asked his cousin Cesar to go outside and get the license plate number of the Jeep Grand Cherokee. Cesar did so, and Cabrera phoned 911 at 12:45 a.m. The recording of the 911 call was played at trial. Cabrera told the dispatcher two Hispanic men around 20 or 21 years old had pointed a black gun at his friend and taken Cabrera's wallet and car keys. Cabrera told the dispatcher the robbers were in a white Cherokee with gray on the bottom and provided the license plate of the Cherokee. He also said the Cherokee was "coming back around the block too. They came, like already four times around the block and they're still coming back." He added, "They're here right now." Cabrera later told the dispatcher the Cherokee had driven away southbound on Compton.

2

Deputy Sheriff Joshua Delfin responded to the 911 call and met both Cabrera and Quevedo at the location of the robbery. Delfin testified that Quevedo said he saw a Jeep Grand Cherokee drop off two men at the corner, those two men approached him and Cabrera and ordered them to hand over everything they had, one of the men pointed a black handgun at Quevedo's head, Quevedo handed over his money and a red Samsung mobile phone, and they saw the same vehicle return to the scene. Delfin testified that Cabrera said a man pointed a gun at his head and took his wallet and car keys. Cabrera gave Delfin the license plate number and described the vehicle and the suspects. Delfin broadcast this information to other sheriff's personnel.

Sergeant Adolfo Barajas heard the broadcast and went out in search of the Jeep Grand Cherokee. He saw it on Compton Avenue and began following it. After verifying that the license plate matched what had been broadcast, Barajas called for backup. The Jeep Grand Cherokee pulled into the parking lot of a McDonalds and was quickly surrounded by sheriff's department patrol cars. Velasquez's brother Alfredo was the driver, Velasquez was in the front passenger seat, and Ortiz was in the rear seat on the driver's side. A deputy conducted a quick search of the Jeep Grand Cherokee and found a black BB gun under the rear passenger seat.

Delfin took Cabrera and Quevedo to a field showup. Cabrera and Quevedo were read a field identification admonishment, separated, and shown Velasquez, Ortiz and Alfredo Velasquez, one at a time. Delfin testified that Quevedo identified Velasquez, saying, "'That's the one that pointed the gun at me and took my property.'" Delfin further testified that Cabrera identified Ortiz, saying, "'That's the one that pointed the gun at me and took my stuff.'" Delfin also testified that Cabrera and Quevedo each identified the Jeep Grand Cherokee sheriff's personnel had stopped as being the vehicle they had seen at the time of the robbery.

The Jeep Grand Cherokee was impounded and Detective Chris Mezzano searched it more thoroughly at the impound yard. Mezzano testified he found $139 in cash inside a change purse on the front passenger seat, a red Samsung mobile phone beneath the

center console, and a black wallet containing Cabrera's identification card in the cargo area of the vehicle. Mezzano returned the wallet and ID to Cabrera and the phone and cash to Quevedo.

Mezzano spoke to Cabrera and Quevedo by phone on April 15. Mezzano testified that Quevedo told him he was walking with Cabrera to Cabrera's car when he heard men running up behind him. Quevedo turned and saw two men. The man in front of Quevedo was a male Hispanic in his early twenties, about five feet eight inches or five feet nine inches tall with a "fat build" and dark complexion. Quevedo also described the man's clothing. The man pointed a handgun at Quevedo's head and said, "'Give me your shit,'" then began to pat down Quevedo's shirt and pants pockets. Quevedo told to Mezzano that the person who robbed him was the person he identified in the showup. Mezzano was not asked what Cabrera told him.

At trial, less than three months after the robberies, Cabrera and Quevedo testified they did not remember or were unsure of various matters, such as whether the robbers had guns, what property had been taken, whether the robbers had gotten out of or into a particular vehicle, or what kind of vehicle it was. Cabrera testified he intentionally looked down, not at the faces of the robbers, and thus could not identify anyone. Cabrera denied telling Delfin that he saw the robbers get out of a white Jeep Grand Cherokee and did not remember saying one of the robbers pointed a gun at his head. He ultimately admitted telling Delfin that after the robbery he saw the robbers run back and get into a white Jeep Grand Cherokee. After Cabrera reviewed the transcript of his 911 call, he recalled seeing a black gun in the hand of one robber. Cabrera testified he told the deputies at the showup that one person they showed him might be the person who robbed him, but he was not sure. Cabrera did not identify either defendant at the preliminary hearing or at trial, but identified the wallet found in the Jeep Grand Cherokee as his and agreed that the vehicle depicted in a photograph of the Jeep Grand Cherokee looked like the one he had seen the robbers run toward. Cabrera testified on direct that he did not

4

"want to be" at trial, and explained on cross-examination that this was due to "[f]ear" and a dislike of courts.

Quevedo testified he just went home after the robbery, but he returned to the area after law enforcement arrived and answered "one question" they asked him. He denied telling a deputy that he handed over $200 because he was fearful. He further denied telling a deputy that the two assailants got out of, and later returned to, a white Jeep Grand Cherokee while the driver remained inside that vehicle, and that he later saw the same vehicle return to the area. Quevedo did not remember making other statements about the robbery and did not recognize the mobile phone depicted in the prosecution's photographic exhibits. Quevedo admitted his mobile phone and some of his money were returned at a later time, but he did not have the phone with him at trial. Quevedo denied identifying anyone or the vehicle at the field showup and claimed he told the deputies he could not identify anyone. He did not identify either defendant at the preliminary hearing or at trial. Quevedo also did not want to testify at trial or the preliminary hearing. Quevedo testified on cross-examination by Velasquez that before the preliminary hearing some "police detectives" said to him, "'Come on, man. Just say it was them and help us out.'" On cross-examination by Ortiz, Quevedo denied anyone said that to him, and instead testified that someone said, "Just 'help us out,' and to tell the truth." Quevedo also denied telling a defense investigator that he felt pressured by "the police."

Mezzano testified that he spoke with Cabrera and Quevedo on the day of the preliminary hearing, and both told him they were "fearful of coming to court." When he served them with subpoenas, they both said they did not want to come to court.

Joseph Linares, an investigator for Ortiz, testified he interviewed Cabrera and Quevedo by phone on May 31. Counsel for Ortiz asked Linares to "characterize" Cabrera's "demeanor" or willingness to cooperate. Linares responded that Cabrera was "very cooperative" and "said he wanted to talk to me." Cabrera told Linares it was dark during the robbery and he intentionally looked at the ground during the robbery and avoided looking at the robbers' faces. He was thus unable to identify them, and he told

5

the sheriff's deputies this. Counsel for Ortiz asked, "[D]id you specifically ask Mr. Cabrera at my direction about an incident that occurred at court in May at the time of the preliminary hearing?" Linares said he did. Counsel asked if Cabrera told "the police" "at that time" that he could not identify anyone and that he did not want to come to court. Linares answered "Yes" to both questions. Linares further testified that Cabrera "said that he felt that the police pressured him to make an identification. He also—I asked him if he felt that he was being pressured by either the arrestees or their family. He said he was not."

Counsel for Ortiz asked Linares to "describe" Quevedo's "demeanor" or willingness to cooperate. Linares responded that Quevedo was cooperative and said, "'I just want to tell the truth.'" Linares testified that Quevedo also said it was dark during the robbery, he was unable to identify anyone, and he told the sheriff's deputies this. Counsel asked, "[D]id you again, specifically at my request, ask about the incident that occurred at the courthouse in May at a time just prior to his preliminary hearing testimony?" Linares said he did, then testified that Quevedo said he told two deputies or detectives in a little interview room "that he could not identify them, and that he didn't want to testify." Quevedo told Linares one of the detectives said, "'Come on man. Just say it was them and help us out. You can help take them off the street because they'll do it again.'" Linares further testified that Quevedo said he felt pressured by "the police," but "did not feel pressured at any time by the family or the arrestees."

Velasquez and Ortiz were tried together by a single jury. The jury convicted each of two counts of second degree robbery. Ortiz waived a jury trial on allegations he had suffered a prior serious felony conviction within the scope of Penal Code section 667, subdivision (a) (undesignated statutory references are to the Penal Code) and the "Three Strikes" law and had served a prior prison term within the scope of section 667.5, subdivision (b)(1). The court found the strike and section 667, subdivision (a) allegations true, but made no mention of the section 667.5, subdivision (b)(1) allegation. The court sentenced Ortiz to a second strike term of six years for the robbery of Quevedo, a

6

consecutive subordinate term of two years for the robbery of Cabrera, and a five-year serious felony enhancement. The court sentenced Velasquez to three years for the robbery of Quevedo and a consecutive subordinate term of one year for the robbery of Cabrera.

## DISCUSSION

### 1. Failure to instruct sua sponte with CALJIC No. 2.05

Velasquez contends that the trial court was required to instruct, sua sponte, with CALJIC No. 2.05, or a comparable limiting instruction. CALJIC No. 2.05 states, "If you find that an effort to procure false or fabricated evidence was made by another person for the defendant's benefit, you may not consider that effort as tending to show the defendant's consciousness of guilt unless you also find that the defendant authorized that effort. If you find defendant authorized the effort, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

Velasquez premises this contention on the following cross-examination of Linares by the prosecutor. Linares testified he was not at the preliminary hearing. The prosecutor then asked, "And you were not there to see what crowds were outside in the outside waiting area and what crowds are inside the preliminary hearing courtroom?" Linares agreed he was not. Over a relevance objection by Velasquez, the prosecutor asked, "You were not able to see how many friends, supporters, or family members from the defense side was [*sic*] at that courtroom; were you?" Linares agreed he was not. The prosecutor asked, "And, yet, you are able to say that you believe that they're being cooperative, and that they just didn't want to testify?" Linares replied, "That's what they told me." The prosecutor then asked, "And since you weren't there at that preliminary hearing, you weren't able to see that in fact Fabian was actually being called out by one of the family members; isn't that true?" Velasquez and Ortiz objected, with the latter noting that the question assumed facts not in evidence. The court directed the prosecutor to reframe her question. She asked, "When you talked to Mr. Quevedo about the preliminary hearing, and you said that he was in an interview room, he was talking to

7

detectives when he says, 'I can't identify anyone,' did he indicate to you that someone had called him a snitch?" Neither defendant objected, and Linares replied, "No." After again confirming that Linares was not present at the preliminary hearing, the prosecutor asked, "And did Mr. Fabian Quevedo or Jordy Cabrera indicate to you that they're afraid of retaliation? Did they indicate this to you?" Linares responded, "No."

On redirect examination, Linares reiterated that he had asked Quevedo and Cabrera "whether they had received any pressure from any of the suspects or their families," and they had said that only "the police" pressured them.

Outside of the presence of the jury, Velasquez made a motion for a mistrial based upon the prosecutor "testifying in the form of a question as to an incident that occurred at preliminary hearing that the victim or victims were called snitches by somebody allegedly related to the defendants—one or both defendants. I think that's improper given the fact that no evidence was offered to that effect." The trial court denied the motion for mistrial.

The prosecutor did not mention any intimidation at the preliminary hearing during her opening statement or her arguments to the jury. After both defendants argued that Quevedo and Cabrera had not identified them at the showup and the deputies had fabricated evidence against them, the prosecutor argued, "[S]omething happened between the time of April 14th to the time of the prelim. What I submit to you is that the victims had time to think about it. They got scared. And I think that it is understandable to be scared. It is not unreasonable to be scared."

The California Supreme Court has "consistently held that where, as here, a defendant fails to request an instruction, a trial court 'generally [has] no duty to instruct on the limited admissibility of evidence. [Citation.]'" (*People v. Valdez* (2012) 55 Cal.4th 82, 139 (*Valdez*) [no sua sponte duty to give limiting instruction regarding witnesses' fear of testifying]; see also *People v. Riccardi* (2012) 54 Cal.4th 758, 824 ["Generally speaking, absent a request, the trial court has no duty to give an instruction limiting the purpose for which evidence may be considered"].)

8

Velasquez relies upon language in *People v. Collie* (1981) 30 Cal.3d 43 (*Collie*), in which the Supreme Court concluded that the trial court had no duty to instruct sua sponte on the limited admissibility of evidence of past criminal conduct, but postulated a limited hypothetical exception to the general rule: "Neither precedent nor policy favors a rule that would saddle the trial court with the duty either to interrupt the testimony *sua sponte* to admonish the jury whenever a witness implicates the defendant in another offense, or to review the entire record at trial's end in search of such testimony. There may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence. But we hold that in this case, and in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." (*Id.* at p. 64.)

This is not the extraordinary case hypothesized in *Collie*. As the court stated in *Valdez, supra*, 55 Cal.4th at page 139, "Defendant's reliance on *Collie* fails because the evidence of the witnesses' fear was more than minimally relevant to a legitimate purpose—supporting the witnesses' credibility—and was not 'a dominant part of the evidence against' defendant. [Citation.] Therefore, the trial court did not err in failing to instruct, sua sponte, on the evidence's limited admissibility." Although the form of some of the prosecutor's questions of Linares may have been objectionable, Velasquez challenges only the trial court's failure to instruct sua sponte. As stated in *Collie, supra*, 30 Cal.3d at page 64, "Neither precedent nor policy favors a rule that would saddle the trial court with the duty" to so instruct.

In addition, the trial court's failure to instruct sua sponte with CALJIC No. 2.05 was harmless because there was no evidence supporting the instruction. The jury was instructed that it must decide all questions of fact from the evidence received at trial. (CALJIC No. 1.03.) No evidence received at trial showed that someone made "an effort

9

to procure false or fabricated evidence . . . for the defendant's benefit." Accordingly, if the trial court had instructed with CALJIC No. 2.05, the jury would not have been able to apply it. The jury was instructed that statements of the attorneys were not evidence, and it should "not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it helps you to understand the answer." (CALJIC No. 1.02.) We presume the jury followed this instruction and did not treat the prosecutor's references to one of the victims being called a snitch or called out by the family of one of the defendants as evidence. (*People v. Williams* (2010) 49 Cal.4th 405, 469.)

## 2.    Ortiz's *Wende* appeal

As noted, counsel for Ortiz filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*), raising no issues and asking this court to perform an independent review of the record. Ortiz then filed a supplemental brief that appears to contend that unspecified hearsay evidence was improperly admitted and that the case should have been dismissed because "the police" told the victims to point out defendants even after the victims said defendants were not the culprits.

Testimony by Delfin and Mezzano regarding the victims' prior statements was properly introduced as a prior inconsistent statement after the victims denied making such statements and claimed not to recall details of the crimes. Although Linares's testimony regarding the victims' statements regarding their identifications, or lack thereof, supported an inference of improper conduct by sheriff's personnel, Delfin's testimony regarding the identifications supported an inference that the victims actually identified the defendants at the field showup. Accordingly, we reject Ortiz's contentions.

We have examined the entire record and are satisfied that Ortiz's attorney has fully complied with his responsibilities and that no arguable issues exist. (*People v. Kelly* (2006) 40 Cal.4th 106, 109–110; *Wende*, *supra*, 25 Cal.3d at p. 441.)

10

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED.


                                                MALLANO, P. J.

We concur:


ROTHSCHILD, J.


JOHNSON, J.