Filed 4/25/14  P. v. Harvey CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B245606 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA384162) |
| v. | |
| HAROLD E. HARVEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert C. Vanderet, Judge.  Affirmed as modified.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Harold E. Harvey appeals from his conviction of three counts of second degree robbery (Pen. Code, § 211) and grand theft (Pen. Code, § 487, subd. (a)).**1** He contends: (1) the trial court incorrectly instructed the jury; and (2) admission of certain evidence was prejudicial error.**2** We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1.      *C.L. Robbery (Count 1)*

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that in April 2011, sisters P.L. and C.L. lived with their family a few blocks from Veronica's Mini Market, located on Vermont Avenue and 49th Street. The evening of April 30, the sisters walked to the market, where C.L. noticed defendant inside the store. They were walking home at about 7:30 p.m. when defendant suddenly came from C.L.'s right side, stood in front of her and demanded she give him the gold necklace she was wearing. C.L. refused until she realized that defendant was pressing a black gun against her stomach. Before C.L. could remove the necklace, defendant yanked it off her neck and walked away.

When they thought defendant could no longer see them, the sisters ran home where they encountered their father and uncle. As soon as the sisters told them what had

---

**1**      All undesignated statutory references are to the Penal Code.

**2**      Defendant was charged in case No. BA384162 with second degree robbery. On September 13, 2011, a mistrial was declared after the jury announced that it could not reach a unanimous verdict. Case No. BA384162 was joined with case No. BA387579 and an amended information was filed charging defendant with three counts of second degree robbery (counts 1, 2 and 3) and grand theft (count 4); enhancements for personal gun use (§ 12022.53, subd. (b)) and committing a felony while released on bail (§ 12022.1) were also alleged. A jury found defendant guilty on all four counts and found true the gun use enhancement as to count 1 and the released on bail enhancement as to counts 2, 3 and 4. Defendant was sentenced to a total of 17 years, 8 months in prison. He timely appealed.

**2**      Defendant also contends, and the People concede, that he is entitled to additional presentence custody and conduct credit. We modify the judgment accordingly.

2

happened and described defendant, father and uncle left in uncle's car. When police arrived a few minutes later, C.L and P.L. recounted the incident to them. P.L.'s recollection of events was consistent with C.L.'s in all material respects. P.L. saw defendant pull a black gun from his waistband, point it at C.L. and demand she give him her necklace. Defendant pulled the necklace off C.L.'s neck and walked away.

Father testified that his daughters described the robber as an African-American male wearing blue pants and a white shirt. Father and uncle drove around the neighborhood looking for someone who matched that description. Within about five minutes, father saw defendant entering a house on the 900 block of 48th Street, around the corner from the market. It was later established that this was where defendant lived with his grandmother and brother.

At about 8:30 that night, defendant sold a "yellow gold chain with a charm" to the Pico Union Pawn Shop for $185.[3]

On May 3, C.L. and P.L. identified defendant from a photographic lineup; their father recognized defendant as the person he saw entering the house on 48th Street. Defendant was arrested the next day, May 4. Police searching defendant's home found, among other things, a hand gun and several broken gold necklaces in an unlocked cabinet drawer. Detectives showed C.L. and P.L. a photograph of that gun, which both girls identified as the gun defendant pointed at C.L. Neither of the necklaces was the one defendant took from C.L.

Defendant's grandmother testified that the police who searched her home after defendant was arrested found two rifles under her bed and a handgun in a drawer in which defendant kept his things. She knew about the rifles, which belonged to her deceased brother, but not about the handgun.

---

**3**    By the time the police contacted the pawn shop about the necklace in November 2011, the shop had already melted the necklace so it was impossible to determine with certainty that it was C.L.'s.

2. *Kerima Brown Robbery (Count 2)*

By June 28, 2011, defendant was out on bail. That day, while on a break from her job at the Washington Square Market, Kerima Brown was standing outside the store entrance and talking to her husband on a cell phone. When she noticed defendant staring at her, Brown backed up because she had a feeling he was about to take her gold necklace. Defendant grabbed the necklace and ran away, eluding a pursuing security guard. But Pedro Ivan Duran, who was pulling his car out of a parking lot, saw defendant struggle with Brown and followed him. Duran saw defendant get into a white car that drove away. Duran was able to get a partial license plate number, which he gave to Brown along with his contact information.[4] Brown and Duran both identified defendant from a photographic lineup, but neither was positive about their identifications. A recording of the robbery taken by the market's security cameras was played for the jury.

3. *Rolando Vasquez Robbery (Count 3)*

At about 4:00 p.m. on July 13, 2011, Rolando Vasquez was parked in front of his wife's store on the 1700 block of West Jefferson Boulevard. Vasquez had accidentally locked himself out of his car and was trying to get into it with the assistance of Jacob Eradat, who owned the store next to Vasquez's wife's store. When Vasquez saw defendant approaching, he assumed defendant was going to offer to help. Instead, defendant grabbed the thick gold necklace Vasquez was wearing. With the necklace in his hand, defendant ran towards the parking lot of a nearby KFC Restaurant and a white car that was parked with its engine running. By the time defendant reached the white car, it was already accelerating. Vasquez and Eradat gave chase but defendant got into the front passenger seat of the white car just ahead of Vasquez. Vasquez heard a woman inside the car shouting. When Vasquez called 911, he described the robber and the white car, including a partial license plate number which Eradat had written down. Vasquez

---

[4] Store manager Veronica Diaz, who watched the robbery occur on security camera monitors in the office, testified that Duran gave her his business card and a piece of paper on which he wrote a license plate number.

4

described the driver as an African-American man, but when he thought about it more, he concluded the driver was a woman because he heard a woman's voice. A recording taken by security cameras at the KFC at the time of the robbery was played for the jury. Vasquez was unable to identify defendant from a photographic lineup shown to him by police, but he recognized him in the courtroom.

Eradat's description of the robbery was identical to Vasquez's in all material respects. Eradat did not see defendant's face during the robbery, but saw it as defendant was getting into the getaway car. Eradat identified defendant from a photographic lineup, but was not sure of his identification. The officer who showed Eradat the lineup testified that Eradat appeared frightened and said he did not want to give an identification. At Eradat's request, the officer noted on the photographic lineup that Eradat was only 10 percent certain of his identification.

4.      *Ray Craig Grand Theft (Count 4)*

In July 2011, Ray Craig had been friends with defendant's brother for about a month. About a week before July 18, Craig met defendant at a party Craig attended with defendant's brother. On July 18, defendant was present when Craig was at the house on 48th Street where defendant and his brother lived. Craig and defendant's brother drove to a nearby basketball court where about 20 people, including John Kim, were playing basketball. Before starting to play, Craig put the $1,500 gold necklace he was wearing, his $200 iPod, $500 cell phone, $300 gold watch and a wallet containing $200 into his backpack, which he left by the court.[5] While he was playing, Craig noticed defendant arrive and sit next to Craig's backpack. Craig had been playing for about 10 minutes when Kim yelled to Craig that someone was stealing his back pack. Looking over, Craig saw defendant running with Craig's backpack towards a champagne colored car in which Craig saw two other people, including someone Craig knew as "Shaq." Defendant got

---

[5]      It was unclear whether the items other than the necklace were in Craig's backpack or in his locked car.

5

into the rear passenger seat of that car, which drove away. Craig left his car at the basketball courts while John Kim drove Craig to defendant's house. Defendant was not there. Craig waited about 10 minutes, then went back to the basketball courts where he discovered that his car's passenger side window had been broken. Craig identified defendant from a photographic lineup.

Kim had once seen defendant in the apartment building where Kim lived. Kim and Craig had mutual acquaintances, but met for the first time at the basketball courts on the evening of July 18, 2011. Kim recalled that he noticed Craig was not in the game. Looking around, Kim saw Craig running towards the street. Craig ran back to the court and announced that his backpack was gone. Craig and some other people got into Kim's car and Kim drove them around, looking for the thief's getaway car. Craig pointed out a champagne colored Ford Taurus which he said was the car. Kim drove Craig to defendant's house, then back to the basketball court. There, they discovered the passenger side window of Craig's car had been smashed with a wrench which was left sitting on the front passenger seat.

5.      *Other Evidence*

Police matched the description of the getaway car and the partial license plate numbers obtained from Duran and Eradat to a car registered to Jasmine Kendrick, which was in an impound lot.[6] Tow yard employees put the personal property they found inside of the car into a plastic bag, which they placed in the car trunk. Among the items found by police in that plastic bag was paperwork relating to a bail bond for defendant. Police also found two gold chains, one of which was broken, between the driver's seat and the center console of that car.

Defendant was arrested on August 8, 2011, as he was leaving his grandmother's home. Recordings of telephone calls defendant made while in jail were played for the jury. Defendant makes various incriminating statement during those calls. For example,

---

**6**      Kendrick was jointly charged in the amended information with the Brown and Vasquez robberies (counts 2 and 3).

in one call, defendant says to an unidentified male, "Hey, hide all that shit! . . . Give it to Granny." In another call, defendant tells an unidentified female that he and "Jasmine" have been arrested and Jasmine is "snitchin." An unidentified female asks defendant, "So, do you want me to give Shaq the necklace?" To which defendant responds, "Nah, nah, nah, nah not right now. I want them to sell that shit and get it out, and get me out." Defendant tells "Javar," "Imma give you all the gold and you all can do your thing and bail me out." Defendant and "Granny" have the following colloquy: "[Defendant]: You gave that chain to Shaq? [¶] [Granny]: No. [¶] [Defendant]: Oh, well shit I think I'm just gonna let you go down there and just cash it out. [¶] [Granny]: Alright. [¶] [Defendant]: Or, Imma find somebody to go with you. Cause I don't even know if I want Shaq to go I think I just want you to go, and then whatever money they give you just put it on my, on my bill. [¶] [Granny]: Okay." In another call, defendant says to Granny, "What about the chai . . . what about the stuff, where's it at?" Granny responds that she gave it to someone who said he could sell it for $400. Defendant tells Granny that he does not know whether Jasmine told, or not. In another call, defendant says to an unidentified male, "They had me on, they had me on two, they got me on two chain snatching and they got me on um some shit . . . at USC." Defendant says that Jasmine is "singing like a bird." Defendant and the unidentified male have the following colloquy: "[Defendant]: They [the police] talk about they was following us all day. [¶] [Unidentified Male]: That's what they said? [¶] [Defendant]: Yeah, but they lying. [¶] [Unidentified Male]: I know they lying. [¶] [Defendant]: Cause if they was following us all day, then trust me they would have had to step in. [¶] [Unidentified Male]: Hmm. [¶] [Defendant]: They can't just let that type of shit go down without you feel me?"

6. *Defense Case*

A gun expert testified about the popularity of the gun that C.L. and P.L. identified as the weapon defendant used in that robbery. Another expert testified as to the unreliability of eyewitness identifications.

7

## DISCUSSION

A.  *Giving A Modified Version of CALCRIM No. 375 Was Not Error*

During deliberations, the jury asked:  "Can we consider the evidence in all counts to determine a verdict in a single count?"  Defendant contends the trial court erred in answering that question as follows:

> "If you decide beyond a reasonable doubt that the defendant committed . . . one or more of the charged crimes, you may, but are not required to, consider evidence relating to those charged crimes that you decide he committed for the following limited purposes:
>
> "(1)  That the defendant was the person who committed the other charged offense;
>
> "(2)  That the defendant acted with the specific intent required on the other offenses; and
>
> "(3)  That the defendant had a common plan or scheme to commit the other offenses alleged in this case.
>
> "Do not consider this evidence for any other purpose.
>
> "Do not conclude from this evidence that the defendant had a bad character or is disposed to commit crime.
>
> "If you conclude beyond a reasonable doubt that the defendant committed one or more of the offenses, that conclusion is only one factor to consider along with the other evidence on the other charges.  It is not sufficient by itself to prove that the defendant is guilty of the other charges.  The People must still prove each charge beyond a reasonable doubt."

Relying on *People v. Armstead* (2002) 102 Cal.App.4th 784 (*Armstead*), defendant argues the instruction improperly changed the scope and basis upon which the evidence relating to the various counts was admitted.  We find defendant's failure to object to the instruction constitutes a waiver of the issue.  Even if there were not a waiver, we would find no merit in the contention.

### 1.  Waiver

The sequence of events is as follows.  In his opening statement, without defense objection, the prosecutor declared that the evidence would show defendant had a modus operandi that involved snatching gold chains from unsuspecting victims.  During the

defense case, the People filed a written motion to admit evidence of defendant's "pattern of robbing unsuspecting victims of their gold necklaces by suddenly ripping them off their necks . . . as corroborating evidence of each of the remaining crimes charged in this case," to show a common scheme or plan and identity.  Defendant did not file written opposition to the motion, nor did defendant object at the hearing on the motion.  The trial court impliedly granted the motion to admit the evidence by stating that the People would be allowed to "argue to the jury that they can and should consider all of the crimes in considering the charges against defendant on issues such as identity, and he's free to argue that similarities in the crimes strengthen the case on each of the crimes."  Although the written motion did not request any specific instruction relevant to the proposed use, the trial court stated it would not instruct "with respect to each of the charged crimes, that [the jury] could consider them in the same way uncharged crimes which get admitted can be considered pursuant to Penal Code section 1101(b) on such issues as identity and common elements of a plan."  The trial court explained its concern that the preponderance of the evidence language in CALCRIM No. 375 would confuse the jury about the correct standard of proof to be applied to the charged offenses.  Without defense objection, the prosecutor argued to the jury that in each robbery and in the grand theft "basically the defendant is operating with the same [modus operandi], the same common plan.  Using the same procedures.  He finds an unsuspecting victim wearing a visible gold chain . . . and he suddenly snatch[s] the chain and leaves quickly.  We're going to see this repeated again and again for each crime."  The prosecutor reiterated: "Again, this is that common plan: unsuspecting victim wearing a visible gold chain, suddenly snatches the chain and leaves quickly."  During deliberations, the jury asked the question that prompted the challenged instruction.  Defendant did not object to the instruction.[7]

---

[7] The record does not include any discussion between the trial court and counsel as to how best to respond to the jury's inquiry.  On appeal, defendant states that the trial court's comments at the hearing on his new trial motion indicate that any objection would have been futile.  Defendant is incorrect.  The futility exception to the waiver rule applies

Generally, "a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Failure to instruct on an element of the offense is an exception to the general rule of waiver, as is an instruction that is legally incorrect. (*Ibid*.)

Neither exception applies in this case. First, the challenged instruction does not go to an element of any of the charged offenses. Second, defendant does not challenge the legal correctness of the instruction. On the contrary, defendant's challenge focuses on the timing of the instruction – after the evidence, argument and beginning of deliberations. Accordingly, by failing to object to the instruction, defendant has failed to preserve the issue for appeal. As we shall explain, even if defendant had not waived the issue, we would find no merit to his contention.

### 2. The Challenged Instruction Did Not Improperly Change the Scope or Admissibility of Evidence

Under Evidence Code section 1101, subdivision (a), evidence of specific instances of conduct is inadmissible to prove a person's conduct on a specified occasion. But Evidence Code section 1101(a) does not preclude "admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as intent, preparation, plan, or identity) other than his or her disposition to commit such an act." (Evid. Code, § 1101(b).) In the usual case, the specific conduct evidence involves uncharged crimes. (See e.g. *People v. Foster* (2010) 50 Cal.4th 1301, 1328 [Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational

---

only where a prior related objection has been overruled. (See e.g. *People v. Arias* (1996) 13 Cal.4th 92, 159-160 [rejecting premise that trial court's treatment of unrelated objections showed that all objections would be futile].) Defendant points to no such ruling, or anything else that would cause us to believe an objection to the instruction would have necessarily been futile.

inference of identity, common design or plan, or intent.].) How similar the uncharged crimes must be to the charged crime depends on the purpose for which the uncharged crime evidence is being admitted – i.e. to prove intent, common plan or design, or identity. For example, to be admissible to prove the existence of a common design or scheme, " '[E]vidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations." ' [Citation.]" (*Foster* at p. 1328.) A greater degree of similarity is necessary in order for uncharged conduct to be admissible to prove identity. (*Ibid*.)

The same admissibility issues do not arise when the issue, as it is here, is whether the jury can consider the fact that the defendant committed one of multiple charged offenses as evidence of common plan or scheme or identity to prove the defendant committed another charged offense. *Armstead* is instructive. In that case, the defendant was charged with nine counts of robbery. During deliberations, the jury asked whether the phrase "consideration of all the evidence" in the reasonable doubt instruction [CALJIC No. 2.90] meant "(1) all of the evidence presented throughout the trial, or (2) all of the evidence presented per count? In other words, do we base our judgment on each count solely on the evidence related specifically to the exact robbery and/or victim?" The trial court responded:

> "You may consider evidence of the other charged crimes in deciding each count under consideration. In doing so you must treat the other crimes evidence as circumstantial evidence and follow the instructions on circumstantial evidence. 'Other crimes' evidence may not be considered to prove that defendant is a person of bad character or that he has a disposition to commit crimes, but may be considered by you only for the limited purpose of determining if it tends to show identity of the perpetrator, motive or intent."

The jury found the defendant guilty on some of the charged counts. The issue on appeal was whether "consistent with due process, a court can change the basis of admissibility of evidence *after* the close of evidence, closing argument and the commencement of jury deliberations." (*Armstead, supra,* 102 Cal.App.4th at p. 786, italics added.) The court

11

found the instruction implied a change to the basis of admissibility of evidence and concluded that doing so after the close of evidence, argument and the beginning of deliberations "did not comport with due process and effectively denied [the defendant] his right to counsel." (*Id*. at p. 792.)

*Armstead* was distinguished in *People v. Spector* (2011) 194 Cal.App.4th 1335, 1386, in which the trial court instructed that other crimes evidence could be used to establish that the defendant committed the charged murder. Citing *Armstead*, the defendant in *Spector* challenged an uncharged misconduct instruction on grounds that "the contested instructional language was 'proposed by the prosecution only after the defense completed its closing argument [and] expanded the grounds upon which the uncharged offense evidence could be considered by the jury." (*Id.* at p. 1386.) The *Spector* court rejected this contention, reasoning that in *Armstead*, the error was that "the trial court decided, after the jury had already begun deliberating, that evidence which had been admitted only to prove charged counts could also be used by the jury as other crimes evidence, despite there having been no discussion of admitting the evidence for that purpose. Here, . . . the question of 'identity' and the question of 'absence of accident, mistake or suicide' were always two sides of the same coin. Nothing new was added." (*Ibid*.)

This case is similar to *Spector*, and *Armstead* is inapposite. Defendant was aware from the prosecutor's opening statement that the People intended to use evidence of each charged crime to prove a common plan as to the others. Further, the evidentiary portion of the trial was still ongoing when the trial court granted the People's motion to admit evidence of defendant's "pattern of robbing unsuspecting victims of their gold necklaces by suddenly ripping them off their necks . . . as corroborating evidence of each of the remaining crimes charged in this case," to show a common scheme or plan and identity. Although the trial court initially declined to instruct along the lines of section 1101(b) out of concern that the preponderance of the evidence language in CALCRIM No. 375 would confuse the jury, it was required to respond to the jury's question. (§ 1138.) There is no argument that the challenged instruction, which clearly stated the reasonable doubt

12

standard, was an incorrect statement of the law. Thus, even though the trial court gave the challenged instruction in response to a jury question during deliberations, this did not represent a change in the basis for admitting the evidence. The evidence had already been admitted for the purpose of proving common design and identity, the points covered by the instruction.

B.     *Evidence of the Broken Gold Chains Found in the Car Was Admissible*

Over defendant's relevance objection, a police officer testified that two gold chains, one of which was broken, were found in Jasmine Kendrick's car. Defendant contends the admission of this evidence was a prejudicial abuse of discretion. He argues that the evidence was irrelevant and more prejudicial than probative under Evidence Code section 352. We find no abuse of discretion.

With certain statutory exceptions, all relevant evidence is admissible. (Evid. Code, § 351.) Relevant evidence is that which has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has discretion to exclude relevant evidence if it finds "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.)

The erroneous admission of evidence will result in reversal only if the appellate court "is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.) A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. Prejudice must be affirmatively demonstrated by the appellant. (*People v. Champion* (1995) 9 Cal.4th 879, 919 [no reasonable probability outcome of trial would have been different if challenged evidence had been excluded].)

Here, the People's theory of the case was that defendant had a distinctive modus operandi of approaching people wearing noticeable gold necklaces in public, snatching

13

the chains off of their necks and absconding. The presence of two gold chains in the front seat of the getaway car associated with some of the robberies tends to prove that modus operandi. The fact that neither chain was identified by the victims of the three charged robberies and one grand theft goes to the weight of the evidence, not its admissibility.

We also reject defendant's Evidence Code section 352 argument. The trial court could have reasonably concluded that because several gold chains were taken in the charged offenses, there was little prejudice in admitting evidence of the gold chains found in Kendrick's car.

Even if we were to find the trial court abused its discretion in admitting evidence of the two gold chains, we would find the error harmless. In addition to the multiple eyewitness identifications of defendant as the perpetrator of the charged offenses, defendant made incriminating statements during the recorded telephone calls that were played for the jury. Thus, even without the challenged gold chain evidence, there was substantial evidence of defendant's modus operandi. Under these circumstances, there is no reasonable probability that defendant would have obtained a more favorable result had the trial court excluded the challenged evidence.

C.  *Evidence of Gold Chains Found in Defendant's Room Did Not Require A Tailored CALCRIM No. 375 Instruction*

In addition to the gold chains found in Kendrick's car, the People introduced evidence of two gold chains found in the drawer with the gun and mail addressed to defendant. Defendant contends that, to the extent this evidence was admitted as specific misconduct evidence to show a common plan or scheme, the trial court had a sua sponte duty to give CALCRIM No. 375. We disagree.

Absent a defense request, the trial court generally has no duty to instruct on the limited admissibility of evidence. (*People v. Valdez* (2012) 55 Cal.4th 82, 139.) In an "extraordinary case", such evidence "might be so obviously important to the case that sua sponte instruction would be needed to protect the defendant from his counsel's

14

inadvertence." (*People v. Collie* (1981) 30 Cal.3d 43, 64.)  This is not that extraordinary case.  Inasmuch as defendant was identified by multiple eye witnesses and made a number of incriminating statements during recorded telephone calls, the gold chain evidence was not particularly important to the case.  As it turned out, the trial court belatedly gave a modified version CALCRIM No. 375 as it related to evidence of each charged crime as tending to prove the other charged crimes.  (See, Discussion, Part A, *ante*.)  The jury clearly understood the notion of limited admissibility of evidence, and the trial court had no sua sponte duty to give a CALCRIM No. 375 instruction specifically tailored to the gold chains found in defendant's room.

## DISPOSITION

The judgment is modified to reflect presentence custody credit of 498 days and conduct credit of 74 days.  As so modified, the judgment is affirmed.  The trial court is ordered to prepare an amended abstract of judgment and transmit it to the Department of Corrections and Rehabilitation.


RUBIN, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.


15